[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Background
This action was brought in 1997 by the Plaintiffs, Robert and Linda Tofolowsky, against the Defendants, Frederick Bilow, and The Joseph J. Mottes Company ("Mottes"). The Plaintiffs claim that certain portions of the foundation of their home, which was built by Bilow, disintegrated to such a degree as to create an unsafe living condition at the property and that the condition of the foundation was due to the use of defective concrete manufactured by Mottes. The Plaintiffs claimed breach of implied warranty by Bilow and that the concrete supplied by Mottes was defective. Summary judgment was granted as to the claims against Bilow on the basis that the statute of limitations on any claims of breach of warranty had expired prior to the institution of this action and that even if the claims against Bilow were construed as product liability claims, Bilow was not a product seller within the meaning of General Statutes § 52-572m. Trial on the product liability claim as to Mottes was held on October 8th and 9th, 2002. The Plaintiffs presented the testimony of the Plaintiff, Linda Tofolowsky; Edward Lackman, a former employee of Mottes; Fred Bilow; Kent Carney, the former building official for the town of Tolland; Frank Soucy, owner of Materials Testing Inc. and certified in a number of areas regarding concrete by the American Concrete Institute; and James Minges, a consulting engineer. The Defendant presented the testimony of Herman Protze, a consultant in construction matters, primarily concrete. The court also reviewed twenty-four exhibits. Post-trial briefs were filed by the parties on December 20th and 23rd, 2002.
 Findings of Fact
Based upon a preponderance of the evidence, the following facts are found.
On February 15, 1985 Robert and Linda Tofolowsky purchased a home at 54 CT Page 3470 Old Kent Road in Tolland from Frederick Bilow, who had built the house.
The concrete used to build the foundation for the Plaintiffs' home in 1984 was supplied by Mottes. Mottes is in the business of the production of concrete. It has been Bilow's only concrete supplier since the 1970s. Mottes' records regarding batch mixes and deliveries that occurred prior to early 1990 were destroyed in a fire.
The house is a raised ranch with about one thousand square feet of living space on the first floor. At the time it was purchased the basement was unfinished but by the end of the summer of 1985 the Plaintiffs had installed electrical and paneling and plumbed for heating to the basement. In doing so they installed a vapor barrier between the foundation and the paneling to protect the wall from moisture.
In April 1993 the Tofolowskys first noticed some cracking in the north and east side of the basement wall. Linda Tofolowsky advised Bilow of this but he did nothing and told her to simply keep an eye out for any further problems. Two years later, in April 1995, the Tofolowskys noticed a tremendous amount of cracks and discoloration in the foundation. They contacted another builder who excavated around the foundation in May of that year. The excavation revealed significant cracking in the foundation on the north and east side of the house. At that time the Plaintiffs also removed the paneling in the basement which revealed more of the foundation and its deterioration. At the request of the Tofolowskys the building inspector for the town of Tolland came to the property to opine as to the condition of the concrete wall and its strength. He did a visual inspection and observed that the concrete wall was very crumbly and that it had a vast amount of cracks. He recommended that the Plaintiffs engage the services of a testing lab to determine the strength of the concrete.
Also in May of 1995, Ed Lackman of the Mottes company, at the request of the Tofolowskys, who had called the company about the concrete, came and did some tests on the foundation. Lackman performed the Swiss Hammer test which measures the density or the strength of concrete by how much it rebounds. It showed the compressive strength of the concrete to be about 2500 psi (pounds per square inch), although Lackman's testing was limited to concrete that was not visibly deteriorated. Lackman also took two core samples from the foundation. The samples were longer than expected based on the horizontal depth of the foundation wall which he believed indicated a problem with the forms used when the concrete was poured, that is, that the forms were breaking or bulging. In addition, the foundation exhibited cold joints which are formed when the concrete is not continuously poured resulting in a weak point and which evidence an CT Page 3471 error by the contractor in the pouring of the foundation. The existence of a cold joint is a violation of the building code. The American Concrete Institute standards require that a wall with a cold joint be taken down. Lackman also noticed that the backfill material used on the site had a decent amount of fines in it which would cause the backfill to retain water, keeping the foundation moist. When he was in the basement of the house he observed that the wall was very wet and there was a horizontal bow in the wall where the cold joint was located.
Around this same time the Tofolowskys hired Materials Testing Inc. to perform additional tests to determine the strength of the concrete. They performed a Windsor Probe Concrete Compressive Strength Test on the site which revealed a compressive strength of 3600 psi on the exterior east wall of the foundation and on the interior east wall the test results fell below the test minimums, that is, less than 3,000 psi. After receiving the results of the tests by Materials Testing Inc., the plaintiffs contacted the town building inspector who determined that some remediation needed to be done. The Plaintiffs then hired Inga Engineering who devised a plan for remediation which required removing a portion of the old foundation and replacing it. They received a no-interest HUD mortgage loan in the amount of $18,500 to finance the repair. In September 1995 the reconstruction began. Bilow performed the reconstruction. The east and north side of the foundation to the house was removed and replaced. For about a month the Plaintiffs, who were allowed to remain in the house during construction, were unable to run their business which was located in the basement of their home, do laundry, or let their children play in the basement playroom. During this time they incurred $2,260 in expenses plus an additional $800 for a new set of precast front stairs.
In March of 1996 Materials Testing Inc. performed a petrographic analysis of the concrete at a cost of $1,100 to the Plaintiffs. A petrographic analysis is a microscopic examination of the concrete which reveals its air content, water to cement ratio, etc. Concrete is composed of cement, sand, stone and water. The cement, sand and stone components of the concrete were normal and the proportions of these components were also normal. The results of the test did reveal that the concrete was non air-entrained and that the concrete had a high water to cement ratio, in excess of .70. Air-entrained means that air has been added to the mixture by a chemical which produces tiny bubbles within the concrete. Air-entrainment makes the concrete more durable. The high water to cement ratio reduces compressive strength and durability. Concrete with such a high water to cement ratio is not durable in a freeze-thaw environment. The analysis also indicated that the concrete had cracking from air voids, pattern cracking, and deposits in cracks which were caused by CT Page 3472 freezing at an early age, perhaps just after setting. However the concrete was poured in September and the weather conditions do not bear this out.
Between the spring of 1996 and 1999 the Plaintiffs did not observe any other changes in the foundation. Then in May 1999 they observed cracking in the west and south sides of the foundation and that there were rust and white stains on these parts of the foundation as well. There have been no problems with the concrete on the floor of the basement of the house. In May of 1999 Materials Testing did a petrographic analysis of the concrete on these sides of the house at a cost of $1,350 and the analysis revealed that the concrete was not air-entrained and the water to cement ratio was approximately .75. The analysis states that lack of air-entrainment would cause the concrete to be susceptible to freeze-thaw deterioration. The Plaintiffs obtained estimates to repair these parts of the foundation of $34,100. They have not yet performed these repairs. Including these estimates, the Plaintiffs claim that they have incurred $57,823.66 in expenses as a result of the problems with the foundation.
Concrete can be made air-entrained either on site or at the concrete plant because it is done by the addition of a chemical into the concrete which creates millions of small bubbles which act as a cushion to the aggregate in the concrete so that if the concrete freezes and thaws it will not crack. The standards of the American Concrete Institute provide that concrete which is subject to freezing and thawing should be air-entrained. Although the building codes reference the American Concrete Institute standards, no building code requires that the concrete for a residential foundation be air-entrained and it is common that residential concrete is not air-entrained. This is because of the vertical angle of the wall and the low chance that it will become saturated with water, unlike a horizontal concrete surface such as a sidewalk. Any concrete that is saturated is likely to have problems, in particular, freeze-thaw. Therefore the lack of air-entrainment is not a defect in the concrete, it may simply make it inappropriate for a particular application.
The building code also does not require any particular water to cement ratio other than a requirement of seven and three quarters gallons of water per sack which is equivalent to a water to cement ratio of approximately .70. The building codes do require that concrete used for residential foundations have a compressive strength of at least 2500 psi; in 1984 the code required a compressive strength of 2000 psi. The .70 water to cement ratio corresponds to a compressive strength of 2500 psi at twenty-eight days after the concrete is poured. CT Page 3473
In building a foundation, forms are first made to hold the concrete as it hardens, and the concrete is poured into the forms. Water can be added to the concrete at the site by the truck driver at the direction of the contractor or the person pouring the foundation and is often added to make the concrete easier to pour. It may be necessary to convey concrete down a chute over some distance and around corners to fill all the forms. Thus water may be added to get the concrete to flow the necessary distance. Water is added not only for workability but for hydration to make the glue which keeps the elements of the concrete together. Therefore the high water to cement ratio in the Plaintiffs' foundation was likely the result of the addition of water at the site.
The Plaintiffs' expert believes that the concrete failed because of freezing and thawing which was caused by the lack of air-entrainment and the high water to cement ratio. The Defendant's expert testified that defects in the foundation were due to the improper workmanship of the foundation subcontractor.
The Plaintiffs do not know who poured the concrete or who the subcontractor, if any, for the foundation for their house was, nor did any of the parties at trial inquire of Bilow as to this information or any information regarding the actual pouring of the concrete for the foundation for the Plaintiffs' home or Bilow's practices in this area at that time.
 Discussion Product Liability
General Statutes § 52-572m (b) defines "product liability claim" as including "all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. `Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." The Plaintiffs recognize that in order to prevail they have the burden to prove by a preponderance of the evidence the elements of their products liability claim. In order to recover on their claim the plaintiffs'" must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation CT Page 3474 was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.' Giglio v. Connecticut Light Power Co.,180 Conn. 230, 234, 429 A.2d 486 (1980); Liberty Mutual Ins. Co. v.Sears, Roebuck Co., 35 Conn. Sup. 687, 690, 406 A.2d 1254 (1979); 2 Restatement (Second), Torts 402A." Coe-Park Donuts, Inc. v. RobertshawControls, 1 Conn. App. 84, 86 (1983).
The product liability statute does not define what is a "product." "`[T]herefore, the definition of what . . . a product is, has been developed entirely by case law.' Williams v. McDonald's of Torrington, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 562657 (May 8, 1997, Hale, J.) (19 Conn.L.Rptr. 427, 427). SeeBobryk v. Lincoln Amusements, Inc., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 547084 (January 5, 1996, Sheldon, J.) (15 Conn.L.Rptr. 617, 619) (defining product as `any item, thing, or commodity which, upon acquiring its physical existence and identity, through the process of manufacture or otherwise, is put in the stream of commerce either by sale, for use, consumption or resale or by lease or bailment'); Dumitrie v. Fernap, Inc., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 288824 (April 25, 1994, Pittman, J.) (11 Conn.L.Rptr. 449, 450) (adopting the Model Uniform Product Liability Act's definition of a product as `an object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce'); Restatement (Third), Torts, Products Liability § 19(a), p. 267 (1997) (`A product is tangible personal property distributed commercially for use or consumption')." Travelers Property Cas. v.Yankee Gas, Superior Court, judicial district of New Haven at Meriden, Docket No. CV99-02666065 (May 19, 2000).
In deciding whether liquid concrete is a product the court may look to other statutes to aid in its determination. Zichichi v. MiddlesexMemorial Hospital, 204 Conn. 399, 403 (1987). For example, General Statutes § 42-115j deals with exceptions to the sale of commodities by liquid measure in Connecticut's Unfair Sales Practices Act. Among the exceptions which list various commodities are, "concrete aggregates, concrete mixtures and loose solid materials such as earth, soil, gravel, crushed stone and the like, when sold by cubic measure . . ." General Statutes § 42-115j (5). Thus liquid concrete is viewed as a commodity and thus fits within the definition set forth in Bobryk.
The Defendant claims that liquid concrete is not a "product" within the meaning of the statute based on the court's holding in Truglio v. HayesConstruction Co., 66 Conn. App. 681 (2001). There the court held that a CT Page 3475 sidewalk constructed using the form and pour method was not a "product" within the meaning of General Statutes § 52-572m and that the Defendant which provided the on-site construction of the sidewalk using that method was providing a service and not a product. The distinction here to Truglio is that the Defendant here is not the entity that constructed the foundation using a similar form and pour method but the manufacturer of the concrete that was used to construct the foundation.Truglio clearly does not stand for the proposition that liquid concrete is not a product as the Defendant claims.
The Defendant also argues that liquid concrete does not fall within the definition of product referenced by the court in Truglio. The trial court used the definition in the Model Uniform Product Liability Act which refers to a product as "any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce . . ." However the Appellate Court did not adopt this definition but simply referenced the trial's court's use of it. In fact, the Court noted that Connecticut did not adopt the Model Act but rather the Draft Uniform Product Liability Law which did not contain a definition for the term "product." In any event, even considering this definition of "product," liquid concrete does have intrinsic value as a component part of many different items, such as the sidewalk in Truglio or the foundation at issue here.
Therefore the liquid concrete supplied by Mottes is a product within the meaning of the product liability statutes.
In order to be subject to a product liability claim the Defendant must be a "product seller" within the meaning of General Statutes § 52-572m
(a) which defines "product seller" as "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." General Statutes § 52-572m (e) defines a "manufacturer" as including "product sellers who design, assemble, fabricate, construct, process, package or otherwise prepare a product or component part of a product prior to its sale to a user or consumer." Mottes is clearly a product seller within the meaning of the act. Mottes is in the business of the production of concrete for sale.
The Plaintiffs acknowledge that in order to prevail they must establish by a preponderance of the evidence that the concrete was defective and that the defect caused their injuries. Sharp v. Wyatt, Inc.,31 Conn. App. 824, 833 (1993). Simply because the Plaintiffs' foundation deteriorated is not sufficient to prove that the concrete mixture which was used to construct it was defective. The court must look to the CT Page 3476 mixture itself rather than the foundation, to determine whether or not it was defective, as the concrete mixture manufactured by Mottes is the "product" on which the Plaintiffs' product liability claim is based. "A product is defective when it is unreasonably dangerous to the consumer or user. Coe-Park Donuts, Inc. v. Robertshaw Controls Co., 1 Conn. App. 84,86, 468 A.2d 292 (1983)." Id.
The Plaintiffs claim that the concrete was defective in that it was not air-entrained and it had a high water content. However there is no building code requirement that the concrete for a residential foundation be air-entrained, and it is common that residential concrete is not air-entrained. Concrete for vertical walls is not air-entrained because of the low chance that they will become saturated with water, unlike a horizontal concrete surface such as a sidewalk. Therefore the lack of air-entrainment is not a defect in the concrete. In any event, concrete can be manufactured with or without the chemicals which cause it to be air-entrained, and the fact that such chemicals are not added to a particular concrete mix does not mean that the mix is defective but only that it may not be appropriate for a particular purpose. In fact, the Plaintiffs admitted the Defendant's special defense which states that "[i]f the defendant supplied concrete to plaintiffs' home, it was not used by the home contractor in the manner that was appropriate for its use."
As to the water content of the concrete, water is a necessary component of concrete. The building codes do not require any specific water to cement ratio for concrete used in residential buildings. In addition, water may be added at the site by the driver of the concrete mixer at the direction of the builder. The only requirements of the code relate to the compressive strength of the concrete, and the concrete in the Plaintiffs' foundation met that standard.
Even if the concrete was defective because of a high water content, the Plaintiffs have not proven the next element of a products liability claim, that is, that the concrete existed in this state at the time of sale. "To maintain a product liability action under 52-572m et seq., the plaintiff must establish and prove, inter alia, `that . . . the defendant was engaged in the business of selling the product . . . [and] the defect existed at the time of the sale . . .' (Emphasis added.) Giglio v.Connecticut Light Power Co., 180 Conn. 230, 234, 429 A.2d 486
(1980); Coe-Park Donuts, Inc. v. Robertshaw Controls Co., 1 Conn. App. 84,86, 468 A.2d 292 (1983); 2 Restatement (Second), Torts 402A." Zichichiv. Middlesex Memorial Hospital, 204 Conn. 399, 403 (1987).
There was no evidence presented as to the ratio of water to cement at CT Page 3477 the time the concrete left the Defendant's plant and arrived on the job site. The evidence was clear that water was likely added at the site. Although the Plaintiffs claim that it could have been added only by the driver of the truck, who they claim was a Mottes employee, the evidence did not establish that he was a Mottes employee or that if he added water he did so solely of his own accord or at the direction of anyone from Mottes. The normal practice is that the contractor or the foundation pourer requests the addition of water at the site to facilitate the pouring of the concrete. Even if, as the Plaintiffs claim, the only water on the site was from the truck controlled by the Mottes' driver, although there was no evidence which established this fact, the issue is not, as the Plaintiffs frame it, "whether the product was defective as a result of something Mottes did or did not do." The issue is whether the concrete was defective when it left Mottes' plant not whether it subsequently became defective because of something Mottes or someone else did at the site when the concrete was being poured from the truck. If it were, then the Plaintiffs' claim would clearly involve the provisions of a service as opposed to a product which is not covered by the Products Liability Act. Truglio v. Hayes Construction Co., 66 Conn. App. 681 (2001).
The issue is whether the concrete manufactured at Mottes' plant and delivered to the site was defective. "It is `within the province of the jury to draw a reasonable and logical inference from the facts proved.'State v. Englehart, 158 Conn. 117, 121, 256 A.2d 231 (1969). The court may infer that the defect in a product existed at the time of sale if there is sufficient evidence to support such an inference. Liberty MutualIns. Co. v. Sears, Roebuck Co., 35 Conn. Sup. 687, 692, 406 A.2d 1254
(1979). The standard of proof to be met is that it was more likely than not that the defect existed at the time the product left the manufacturer. See 2 Frumer Friedman, Products Liability 16A[4][e][ii]." Coe-Park Donuts, Inc. v. Robertshaw Controls,1 Conn. App. 84, 88-89 (1983). The Plaintiffs must also establish that the product "was intended to and did reach the ultimate consumer without substantial change in condition." Potter v. Chicago Pneumatic ToolCompany, 241 Conn. 199, 236 (1997). In this case there was insufficient evidence from which the court could infer that the concrete that was used in the Plaintiffs' foundation was in the same state then as it was in the truck when it left the plant, and that it had not undergone a substantial change. There was no evidence presented regarding the nature of the components of the concrete when it left the plant or the water to cement ratio in the mix at that time or indeed any evidence related to Mottes' practices in these areas. Therefore the Plaintiffs have failed to meet their burden to prove that the concrete was defective, and the Plaintiffs' claim must fail. CT Page 3478
In light of this conclusion, the court need not consider he Defendant's claim that the concrete was altered or modified and that such alteration or modification was the sole proximate cause of the Plaintiffs' harm.Potter v. Chicago Pneumatic Tool Company, 241 Conn. 199, 236 (1997). The court notes, however, that the facts establish that the problems with the Plaintiffs' foundation were caused by the poor workmanship of the entity responsible for the construction of the foundation rather than by any defect in the concrete.
 Statute of Limitations
The Defendant claims that the Plaintiffs' claim is barred by the applicable statute of limitations. General Statutes § 52-577a states: "(a) No product liability claim as defined in section 52-572m shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered except that, subject to subsections (c), (d) and (e), no such action may be brought against any party nor may any party be impleaded pursuant to subsection (b) later than ten years from the date that the party last parted with possession or control of the product . . . (c) The ten-year limitation provided for in subsection (a) shall not apply to any product liability claim brought by a claimant who is not entitled to compensation under chapter 568, provided the claimant can prove that the harm occurred during the useful safe life of the product. In determining whether a product's useful safe life has expired, the trier of fact may consider among other factors: (1) The effect on the product of wear and tear or deterioration from natural causes; (2) the effect of climatic and other local conditions in which the product was used; (3) the policy of the user and similar users as to repairs, renewals and replacements; (4) representations, instructions and warnings made by the product seller about the useful safe life of the product; and (5) any modification or alteration of the product by a user or third party."
Here the Plaintiffs discovered some minor cracking in their foundation in 1993 but at that time there was no indication that it was causing any damage to their home. It was not until 1995 that they discovered the significant deterioration of their foundation such that they were required to repair it. General Statutes § 52-577a requires that a product liability claim be brought within three years from the date when the property damage is first sustained or discovered. Here the Plaintiffs did not discover or sustain any significant property damage until 1995. Thus their complaint was brought within the applicable three period.
The Defendant claims that even assuming that the Plaintiffs' claim was CT Page 3479 brought within the three-year period, their claim is barred due to the ten-year limitation period from the date that the Defendant last parted with possession or control of the product.
It is undisputed that the Plaintiffs purchased their home in 1985 and the foundation was laid some time in 1984. This suit was not brought until 1997, more than ten years later. Even assuming that Mottes had some control of the pouring of the concrete for the foundation, once the foundation was poured then Mottes no longer had possession and control of the concrete. "It is essential to follow the precise direction of §52-577a (a). It unequivocally states that no action can be brought later than ten years `from the date that the party last parted with possession or control of the product.' (Emphasis added.)" Kelemen v. Rimrock Corp.,207 Conn. 599, 606 (1988). Thus the ten-year period began to run in 1984.
The Plaintiffs can only overcome this limitation if they "can prove
that the harm occurred during the useful safe life of the product." (Emphasis added.) The Plaintiffs have not attempted to provide such proof and, in any event, the evidence established that the useful life of liquid concrete is only about two hours. Therefore the Plaintiffs' claim is barred by the statute of limitations.
 Conclusion
Judgment shall enter for the Defendant.
Jane S. Scholl, J. CT Page 3480